IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, ) | |
| ) | |
| v. ) | Case No. 19 CR 874 |
| ) | |
| DARIUS MORALES ) | Judge Amy J. St. Eve |
| ) | |

**MEMORANDUM OPINION AND ORDER**

On August 12, 2021, following a three-day trial, the jury returned a guilty verdict as to Defendant Darius Morales on the count of knowingly being a felon in possession of a firearm, in violation of 18 U.S.C. § 922(g). Defendant has filed a motion for a new trial and for judgment of acquittal. (Doc. 106). For the reasons discussed below, Defendant's motion is denied.

**BACKGROUND**

A federal grand jury returned a single-count indictment, on November 19, 2019, charging Defendant with knowingly being a felon in possession of a firearm, in violation of 18 U.S.C. § 922(g). (Doc. 1, Indict.). Defendant pleaded not guilty to the charge, and the case proceeded to a jury trial. Before trial, defense counsel filed a motion in limine to bar evidence of a shooting in an alley on the day in question pursuant to Federal Rules of Evidence 104(b), 404(b), and 403. (Doc. 43; Doc. 73). The Court denied the motion, concluding that the evidence of the shooting was not Rule 404(b) "other acts" evidence, but rather direct evidence of Defendant's possession of the firearm, his motivation to flee the scene, and part of the chronology of events. (Doc. 89). The Court further concluded that any potential prejudice under Rule 403 could be cured by an

appropriate jury instruction. The parties agreed to the Court's proposed jury instruction that clarified that Defendant was not charged with discharging a firearm.

At trial, the evidence established that on May 8, 2019, at approximately 3:30 p.m., shots were fired in the alley between the 2100 blocks of Darrow and Dewey Avenues in Evanston, Illinois. Four witnesses—Brian O'Malley, Melissa Coward, Evanston Police Department Detective Anthony Sosa, and Evanston Police Department Detective Amin Virani—testified at trial about the circumstances of the shooting. Brian O'Malley testified that he saw an individual facing a grey Jeep in the alley, shooting at a man dressed in red and black. According to Mr. O'Malley, the person shooting the gun was clean shaven and wore dark clothing, "sort of like track pants." (Doc. 112, 128:8–9). Mr. O'Malley also testified that the individual was large, but not heavy set.[1] After the shooting stopped, Mr. O'Malley took a video with his cellphone of the Jeep driving out of the alley toward Simpson Street.

Ms. Coward testified that on May 8, 2019, she lived at 2121 Darrow Avenue. Ms. Coward testified that she was home in her third-floor apartment when she heard gunshots and looked out of her window that had a view of the alley. She saw a person in dark clothing get into the passenger side of a grey vehicle. Ms. Coward then observed the vehicle drive through the alley toward Simpson Street. The jury viewed bodycam footage from an Evanston Police Officer that showed Ms. Coward's window, balcony, and line of sight.

Detective Anthony Sosa saw a grey Jeep leave the alley, heading west on Simpson Street. Detective Sosa activated his lights and sirens, and proceeded to follow the Jeep. During the chase, Detective Sosa momentarily lost sight of the Jeep, but eventually caught up with the Jeep

---

[1] At the time of his arrest, Defendant was wearing dark denim pants, not track pants. Defendant also appeared to be average height and somewhat heavy set.

after it had crashed into a residential fence, knocking it flat. The residence was on the corner of Lincoln Street and Sherman Avenue in Evanston. Dashcam footage from Detective Sosa's vehicle captured his pursuit from the mouth of the alley to where he saw the Jeep crashed into the fence.

Alan Grampp, who lives on the corner of Lincoln and Sherman where the Jeep crashed, testified that he was home when he heard a loud noise, and looked out his window. Mr. Grampp saw the Jeep hit the fence. He also observed two men exit the Jeep. According to Mr. Grampp, the passenger was wearing dark clothing and the driver was wearing a white and black windbreaker. Mr. Grampp observed the occupants of the Jeep run away from the vehicle.

Richard Buchannan testified that he lives on Lincoln Street and has Nest cameras installed on his garage. After hearing the commotion in his neighborhood, he checked his Nest camera footage and forwarded the footage to the Evanston Police Department. The footage shows two individuals who were later identified as Defendant and Twan Daniels-Robinson. In the footage, Defendant and Daniels-Robinson can be seen running through backyards adjacent to the crash site. Defendant is dressed in black clothing, and Daniels-Robinson is wearing a white and blue jacket. Evanston Police Officers arrested Defendant a few blocks away from the crashed Jeep.

Shortly after arresting Defendant, Evanston Police Officers asked Brian O'Malley to make an identification. The audio from Mr. O'Malley's identification was caught on dashcam footage and played to the jury. Upon seeing Defendant—and when asked if Defendant was the shooter in the alley—Mr. O'Malley simply answered "no." Mr. O'Malley did not qualify his negative identification. At trial, Mr. O'Malley explained his negative identification, claiming that

he was unable to identify anyone, not that Defendant was not the shooter. Defense counsel vigorously cross-examined Mr. O'Malley on this point.

Detective Virani, who also works as an evidence technician, processed both the crash site and the site of the shooting. He recovered a firearm from the fence in front of the Jeep, a magazine to the firearm from the roof of the Jeep, two water bottles (one from the Jeep's front console and one from the Jeep's backseat), and a black sweatshirt from the ground outside the passenger's side of the Jeep. While processing the evidence, Detective Virani observed a fingerprint impression on the firearm, and took a photograph of it. Detective Virani brought the photograph to fingerprint examiner Larry Miller. He then swabbed the handgrip of the firearm for DNA testing, and applied dusting powder, fuming, and dye-staining to the firearm to make the fingerprint impression more visible. Detective Virani also swabbed both water bottles for DNA. In addition, he recovered cartridge casings from the scene of the shooting and photographed them, noting that the casings were the same as those recovered from the magazine found on the roof of the Jeep.[2]

Mr. Miller testified as an expert on fingerprint examination. Mr. Miller testified that he conducted his fingerprint analysis by comparing the photograph of the fingerprint from Detective Virani to the fingerprint impression on Defendant's fingerprint card. Mr. Miller concluded that the fingerprint impression on the firearm matched that of Defendant's right thumb. On direct examination, and again during cross-examination, Mr. Miller testified that the fingerprint was one of the best he had seen.

---

[2] Ballistics expert Gary Lind also testified that the six discharged cartridge casings from the alley were fired from the same firearm Detective Virani recovered from near the crashed Jeep.

Karl Witt, an Evanston Police Department Officer, testified that he collected buccal swabs from Defendant and Twan Daniels-Robinson two days after their arrest. Maria Salazar, an expert on DNA analysis, testified that she compared the DNA profiles from the firearm and the two water bottles recovered from the Jeep. She concluded that the DNA from the water bottle in the front seat matched to Daniels-Robinson, and that Defendant was excluded. Ms. Salazar further concluded that there were three contributors for the DNA on the grip of the firearm, but that there was only one major profile suitable for comparison analysis. That major profile was a match to Defendant, and Daniels-Robinson was excluded as a contributor of DNA. Ms. Salazar lastly concluded that the DNA profile for the water bottle in the back seat of the Jeep was a match to Defendant.

The parties entered into several stipulations at the trial. First, Defendant stipulated that, prior to May 8, 2019, he had been convicted of a crime punishable by a term of imprisonment exceeding one year, and that he knew he had been convicted of such a crime. He also stipulated that a gunshot residue analysis performed by the Illinois State Police concluded that Defendant and Daniels-Robinson may not have discharged a firearm with either hand, and that if they did discharge a firearm, then particles were not deposited, were removed by activity, or otherwise not detected by the procedure.

Defense counsel extensively cross-examined each witness, raising issues such as Ms. Coward's visibility, the quality of the fingerprint, and inconsistencies with the witnesses' testimony such as Mr. O'Malley's statement that the shooter was wearing track pants while Defendant was clearly wearing denim. Defense counsel also played footage from an Evanston pod camera, showing another individual who was large but thin, wearing black track pants, and holding a firearm near the mouth of the alley at around the same time as the shooting.

During closing arguments, the government made several statements tying Defendant to the shooting in the alley: "Why did he have this gun in his hand? He was trying to shoot someone in the alley between Dewey and Darrow. He had a get-away driver, and they fled in his Jeep"; and "But the shooting explains why defendant had the gun. His motive for possessing the gun was to shoot at the guy in the red and black, the intended victim." (Doc. 112, 482:17–19; 486:17–19). The government also tied Defendant to the black sweatshirt found at the scene: "Now, because the defendant was the shooter in the alley, he tried to get rid of the evidence tying him to the shooting. He leaves his black sweatshirt on the ground by the passenger side. He leaves the magazine on the Jeep and the gun on the fence." (Doc. 112, 488:13–17). Defense counsel did not object to any of these statements. During closing arguments, defense counsel challenged the witnesses' statements, the fingerprint and DNA evidence, and posited that Mr. O'Malley and Ms. Coward actually saw a third individual who appeared on Evanston pod camera footage. The jury convicted Defendant. Defendant now moves for judgment of acquittal and a new trial.

## LEGAL STANDARD

Under Rule Federal Rule of Criminal Procedure 29(c), the district court should grant a motion for judgment of acquittal only when "the evidence is insufficient to sustain a conviction." *United States v. Jackson*, 5 F.4th 676, 682 (7th Cir. 2021). *See also United States v. Moses*, 513 F.3d 727, 733 (7th Cir. 2008). A court reviewing a Rule 29 motion should "view the evidence in the light most favorable to the government and ask whether any rational jury could have found the essential elements of the charged crime beyond a reasonable doubt." *United States v. Presbitero*, 569 F.3d 691, 704 (7th Cir. 2009); *see also United States v. Colon,* 919 F.3d 510, 514

(7th Cir. 2019); *United States v. Jones*, 713 F.3d 336, 339-40 (7th Cir. 2013). A court "will only set aside a guilty verdict on the basis of insufficient evidence 'if the record contains no evidence from which a reasonable juror could have found the defendant guilty.'" *United States v. Al-Awadi*, 873 F.3d 592, 600 (7th Cir. 2017), *quoting United States v. Longstreet*, 567 F.3d 911, 918 (7th Cir. 2009).

Under Federal Rule of Criminal Procedure 33, a district court may "vacate any judgment and grant a new trial if the interest of justice so requires." *United States v. Maclin*, 915 F.3d 440, 444 (7th Cir. 2019). "[C]ourts have interpreted [Rule 33] to require a new trial 'in the interests of justice' in a variety of situations in which the substantial rights of the defendant have been jeopardized by errors or omissions during trial." *United States v. Hamdan*, 910 F.3d 351, 357 (7th Cir. 2018). *See also United States v. Eberhart*, 388 F.3d 1043, 1048 (7th Cir. 2004) (quoting *United States v. Kuzniar*, 881 F.2d 466, 470 (7th Cir. 1989)), *overruled on other grounds*, 546 U.S. 12, 126 S.Ct. 403, 163 L.Ed.2d 14 (2005).

"'A … verdict in a criminal case is not to be overturned lightly, and therefore a Rule 33 motion is not to be granted lightly.'" *Eberhart*, 388 F.3d at 1048 (quoting *United States v. Santos*, 20 F.3d 280, 285 (7th Cir. 1994)). Accordingly, a court may grant a new trial if the jury's verdict is "so contrary to the weight of the evidence that a new trial is required in the interest of justice." *United States v. Washington*, 184 F.3d 653, 657 (7th Cir. 1999) ("The focus in a motion for a new trial is not on whether the testimony is so incredible that it should have been excluded. Rather, the court considers whether the verdict is against the manifest weight of the evidence, taking into account the credibility of the witnesses."). "Granting a new trial in the 'interest of justice' is reserved for only the most extreme cases, and we approach such motions with great caution and

7

are wary of second-guessing the determinations of both judge and jury." *United States v. Coscia*, 4 F.4th 454, 465 (7th Cir. 2021) (citations and quotations omitted).

## DISCUSSION

Defendant has moved for a judgment of acquittal under Rule 29,[3] or a new trial under Rule 33, raising twenty-one underdeveloped, perfunctory arguments. Indeed, many of his arguments are presented in a single sentence. Defendant fails to cite to any supporting law, and his initial motion fails to cite to the record, the trial transcripts, or any specific statements. The Seventh Circuit has repeatedly clarified that underdeveloped and merely perfunctory arguments like this are waived. *See United States v. Hassebrock*, 663 F.3d 906, 914 (7th Cir. 2011) (finding the argument was "decidedly underdeveloped and therefore waived"); *United States v. Foster*, 652 F.3d 776, 793 (7th Cir. 2011) ("As we have said numerous times, underdeveloped arguments are deemed waived[.]") (internal quotation marks omitted); *see also Willis v. Lepine*, 687 F.3d 826, 836 (7th Cir. 2012) ("Merely reciting the Rule 59(a) standard and then tossing the motion into the court's lap is not enough. Failure to adequately present an issue to the district court waives the issue on appeal."). Despite Defendant's waiver, the Court will address each argument.

### I. Sufficiency of the Evidence and Witness Credibility

Defendant first attacks the sufficiency of the evidence adduced at trial. He identifies numerous areas of insufficiency (by the Court's count, thirteen such arguments), at least four of which involve the credibility of certain witnesses. Defendant argues, for example, that the evidence is insufficient to convict Defendant because the Evanston Police Department could

---

[3] Defense counsel did not move for a judgment of acquittal under Rule 29 after the close of the government's case.

8

have swabbed the sweatshirt for DNA but failed to do so; the Evanston Police Department failed to investigate the pod camera footage showing another individual in black track pants; the water bottle with Defendant's DNA was found in the back seat of the vehicle, even though various witnesses claimed Defendant was the front-seat passenger; Melissa Coward could not have seen the alley given her vantage point, as seen from bodycam footage, despite testifying as an eyewitness to the shooting; and Brian O'Malley rejected Defendant as the shooter during a show-up, and Mr. O'Malley's post-hoc explanation of his negative identification is not credible.

None of these arguments have merit. Each of Defendant's arguments views a piece of evidence in isolation and attacks that piece as insufficient. In totality, the evidence was more than enough to convict Defendant of the crime charged.

In order to convict Defendant of the crime of knowingly being a felon in possession of a firearm, the government had to prove the following elements beyond a reasonable doubt: (1) that the defendant knowingly possessed a firearm; (2) that he was a convicted felon at the time he possessed the firearm; (3) that the defendant knew at the time he possessed the firearm that he had been convicted of a crime punishable by imprisonment for more than one year; and (4) that the firearm traveled in interstate commerce. *Rehaif v. United States*, ––– U.S. –––, 139 S. Ct. 2191, 204 L.Ed.2d 594 (2019). *See also United States v. Hammond*, 996 F.3d 374, 395 (7th Cir. 2021). Viewing the evidence in the light most favorable to the government, the evidence showed that Defendant—who had been convicted of a crime punishable by a term of imprisonment exceeding one year and knew that he had been convicted of such a crime—was in an alley in which shots were fired. Defendant fled the scene of the shooting in a grey Jeep that eventually crashed into a fence, and Defendant left the Jeep and ran through various backyards until his arrest. Evanston Police Officers found the firearm in front of the Jeep which had both

Defendant's fingerprint and DNA on it, and the firearm's magazine on top of the Jeep. Defendant was wearing dark clothing, which corroborated eyewitness testimony regarding the individual in the alley, specifically the passenger of the Jeep. The fingerprint expert, Larry Miller, and DNA expert, Maria Salazar, testified that they found Defendant's fingerprint and DNA on the firearm. The jury viewed a picture of the firearm, and could clearly see the fingerprint and compare that image to Mr. Miller's testimony on the matter. Ms. Salazar further testified that Defendant's DNA was left on a water bottle near the backseat of the Jeep and on the handgrip of the firearm. In light of this evidence adduced at trial, the Court finds more than sufficient evidence to convict Defendant of the offense with which he was charged.

Several of Defendant's sufficiency arguments invoke the credibility of several witnesses. On a Rule 29 motion, these arguments are a nonstarter. The Seventh Circuit has repeatedly affirmed that it is "the exclusive function of the jury to determine the credibility of witnesses, resolve evidentiary conflicts, and draw reasonable inferences." *United States v. Godinez*, 7 F.4th 628, 638-39 (7th Cir. 2021) (citations and quotations omitted). The jury had the opportunity to observe the witnesses as they testified, compare the trial testimony to the witnesses' prior statements, and view dashcam footage of the witnesses at the scene and the show up. The defense also extensively cross-examined all the witnesses, particularly on issues of credibility. When taken as a whole, there was enough evidence for the jury to find guilt beyond a reasonable doubt.

## II.  Government's Statements During Closing Arguments

Defendant next argues that several of the government's statements during closing arguments prejudiced Defendant.[4] The Seventh Circuit follows a two-step analysis when

---

[4] Defendant made no objections during the government's closing argument.

assessing statements made during closing arguments. *See United States v. Smith*, 674 F.3d 722, 728-29 (7th Cir. 2012); *United States v. Durham*, 766 F.3d 672, 684-85 (7th Cir. 2014). First, the court examines the remarks in isolation to determine whether they were improper. *Durham*, 766 F.3d at 684. If the court does not find the remarks improper, the analysis ends. *Id.* at 685. Where the marks are found improper, the court examines them in light of the entire record to determine whether the challenged statements "so infected the trial with unfairness as to make the resulting conviction a denial of due process." *Darden v. Wainwright*, 477 U.S. 168, 181 (1986) *quoting Donnelly v. DeChristoforo*, 416 U.S. 637, 643 (1974). *See also United States v. Common*, 818 F.3d 323, 331 (7th Cir. 2016) ("Improper comments during closing arguments rarely rise to the level of reversible error.").

Defendant identifies three issues with the government's closing arguments: (1) the government impermissibly "vouched" for Ms. Coward's credibility; (2) the government misstated Mr. O'Malley's testimony regarding his identification of Defendant; and (3) the government prejudicially tied Defendant to the shooting in the alley. The Court addresses each argument in turn.

First, Defendant argues that the government impermissibly "vouched" for Ms. Coward's credibility. Generally, "[a] prosecutor may not vouch for a witness by personally endorsing that witness's truthfulness, or by implying that facts not in evidence support the witness's credibility." *United States v. Briseno*, 843 F.3d 264, 272 (7th Cir. 2016); *see also United States v. Clarke*, 227 F.3d 874, 884 (7th Cir. 2000) (statements proper where "the government was arguing that [the witness] told the truth based on what was in the record, not upon the prosecutor's own personal belief").

Here, the government stated: "You heard Ms. Coward testify that she did see somebody get into the passenger side of the car that she saw. That person was wearing all black. Again, that's what she told you, no more, no less. She did what she could, and she – when – she did what she could to tell the police and muster her recollection of what she saw that day." (Doc. 112, 509:24–510:4). There was nothing improper about this statement. It was an accurate restatement and summation of Ms. Coward's trial testimony. (Doc. 110, 33:3–34:18). At no point did the government "claim personal knowledge of the witnesses' veracity or imply that evidence outside of the trial record confirmed their credibility, which is the sort of vouching that is proscribed." *United States v. Brasher*, 962 F.3d 254, 270 (7th Cir. 2020). The government's brief remarks were not improper, and even if they were, they did not "so infect[] the trial with unfairness as to make the resulting conviction a denial of due process." *Darden*, 477 U.S. at 181.

Defendant's second argument is that the government misstated the evidence by claiming "that Mr. O'Malley's testimony was only that he started to have misgivings about identifying anyone and decided that he did not see well enough to make an identification." (Doc. 106 ¶ 5). The government did not misstate the evidence. During his trial testimony, when asked about his negative identification of Defendant, Mr. O'Malley stated:

> At that point, especially since it was the second group of people, I had already come to the conclusion that I would not be able to comfortably identify the person that— that did the shooting. So by—by that time, I just knew I wasn't able to identify him, but I wasn't saying that that was definitely not the person, just that I could not identify that being the person. (Doc. 111, 135:14–20).

The government accurately stated Mr. O'Malley's trial testimony. Defense counsel may believe that Mr. O'Malley's testimony was incredible. Indeed, defense counsel thoroughly cross-examined Mr. O'Malley on this point—and even played dashcam footage so the jury could hear Mr. O'Malley's original negative identification of Defendant. Once the defense has done so, it becomes

the prerogative of the jury to weigh Mr. O'Malley's statements and determine credibility. It was perfectly permissible for the government to restate Mr. O'Malley's trial testimony, even if Defendant disagreed with it or found it incredible. The government accurately restated Mr. O'Malley's testimony, and this statement was not improper.

Finally, Defendant argues that the government unfairly prejudiced him when it accused Defendant of being the shooter in the alley and otherwise tied Defendant to the shooting. During closing arguments, the government made statements such as, "Now, because the defendant was the shooter in the alley, he tried to get rid of the evidence tying him to the shooting. He leaves his black sweatshirt on the ground by the passenger side"; "Why did he have this gun in his hand? He was trying to shoot someone in the alley between Dewey and Darrow"; and "But the shooting explains why defendant had the gun. His motive for possessing the gun was to shoot at the guy in the red and black, the intended victim." (Doc. 112, 482:17–19; 486:17–19; 488:13–17). Defendant failed to object to any of these statements.

Defendant argues that these statements were inflammatory and contradicted the government's position it had taken when responding to Defendant's motion in limine regarding the shooting. He further claims that, based on the speed of the jury's deliberations, it appears that the jury did not sufficiently consider the jury instructions, particularly the instruction that Defendant is not charged with discharging a firearm. The government responds that its statements were reasonable inferences drawn from the evidence, that the Court's jury instruction would have cured any potential prejudice, and that its statements addressed the central issue of Defendant's possession. Ultimately, the Court concludes that these statements were not prejudicial and thus did not deprive Defendant of due process.

Defendant was not charged with the shooting in the alley. As the court previously ruled, however, this was direct evidence regarding whether Defendant possessed the gun, including his motivation for possessing it. In order to clarify the relevance of the evidence, the court instructed the jury as follows:

> You have heard evidence that the defendant fired shots near an alley by 2100 Dewey in Evanston, Illinois. Defendant is not charged with shooting a firearm. Before considering this evidence, you must decide whether it is more likely than not that the defendant took the actions that are not charged in the indictment. If you decide that he did, then you may consider that evidence to help you decide whether he unlawfully possessed a firearm as charged in the indictment. You may not consider this evidence for any other purpose. The government has the burden to prove beyond a reasonable doubt the elements of the crime charged in the indictment. (Doc. 101, p. 24).

Even if the government's statements went too far, the instructions mitigated any potential risk that the jury would improperly consider the government's argument. *United States v. Guzman-Cordoba*, 988 F.3d 391, 406 (7th Cir. 2021) (juries are presumed to follow a court's instructions).

Contrary to Defendant's arguments, the length of time the jury deliberated says little about the jury's attention to instructions. *See United States v. Cunningham*, 108 F.3d 120, 123-24 (7th Cir. 1997) ("[The judge] cannot hold an hourglass over the jury. If the evidence is sufficient to support the verdict, the length of time the jury deliberates is immaterial."). And "[a]bsent any showing that the jury could not follow the court's limiting instruction, we presume that the jury limited its consideration of the testimony in accordance with the court's instruction." *United States v. Mallet*, 496 F.3d 798, 802 (7th Cir. 2007).

Further, Defendant had an opportunity to respond to the government's statements with his closing arguments and to put forth his own theory of the case. Moreover, even if the government's statements were improper, given the DNA, fingerprint, and circumstantial evidence tying Defendant to the firearm, the statements did not infect the trial with unfairness and deprive him of due process.

## **CONCLUSION**

For these reasons, Defendant's motion (Doc. 106) is denied.

**Dated:** November 15, 2021

                                                              _____

                                                              AMY J. ST. EVE

United States Circuit Court Judge

                                                              (Sitting by Designation)